(160 App. Div. 190)

## WAHLHEIMER v. HARDENBERGH.

(Supreme Court, Appellate Division, First Department.   January 9, 1914.)

1. LIBEL AND SLANDER (§ 74*)—PARTIES LIABLE—OFFICERS OF VOLUNTARY ASSOCIATIONS.

   The general manager of a newspaper association, composed of newspapers and the Associated Press, organized to disseminate news to its members at their pro rata cost, but not to make a profit or engage in business, who has power to employ reporters and editors, including day and night managers, to collect and disseminate news, is liable for the publication of a libel, by a reporter sending to the newspapers for publication a libelous statement.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 175–178; Dec. Dig. § 74.*]

2. LIBEL AND SLANDER (§ 74*)—PARTIES LIABLE.

   All persons connected with the publication of a libel are responsible as joint tort-feasors for the damage caused thereby.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 175–178; Dec. Dig. § 74.*]

3. LIBEL AND SLANDER (§ 123*)—DAMAGES—PUNITIVE DAMAGES—QUESTION FOR JURY.

   Where one was liable for a libelous publication by a newspaper reporter employed by him, the court properly left it to the jury to award punitive damages on the evidence that the libel was recklessly published without inquiry or investigation, since whether the malice calls for punitive damages is for the jury, though defendant gives evidence that there was in fact no actual malice.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

   Clarke and Scott, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by George Wahlheimer against James E. Hardenbergh. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Jay & Candler, of New York City (Robert W. Candler, of New York City, of counsel), for appellant.

J. Noble Hayes, of New York City, for respondent.

INGRAHAM, P. J.   The action was for libel, and the libel published of the plaintiff was clearly libelous per se. The only question is whether this defendant is responsible for the publication of the libel.

It seems that certain newspapers in the city of New York organized what was called the New York City News Association, adopted a constitution and by-laws, stating that the object of the association was the gathering and distribution to its members of any and all kinds of news, that the association is not to make a profit and is not to engage in the business of selling or trafficking in news, and providing that the association shall consist of a number of newspapers and the Associated Press, that to each member should be issued a certificate signed by the

secretary of the association designating the newspaper entitled to receive reports from the News Association, that there should be officers and an executive committee of five, and prescribing the duties of the officers and the executive committee, and further providing that the association should appoint a manager and prescribe his duties. This instrument does not appear to have been signed by corporation or individuals, no individual or corporation being named as those organizing the corporation, and the articles of association merely contained the names of certain newspapers and the Associated Press. The expenses of the association were to be met by a pro rata assessment upon each newspaper. It does not appear by whom the newspapers were represented. The defendant was appointed general manager and secretary. His duty was to supervise the operation of the association under the direction of the executive committee, to manage the business and the financial end of the association, and to see that the work was carried on as directed by the executive committee. He did not edit or have charge of the stories that were sent out; that work was assigned to assistant managers and editors. After the news is collected by reporters, it is written out by editors, the day manager determines what stories shall be sent out during the day, and the night manager, when he is on duty, determines what stories shall be sent out during the night. The executive committee consists of five persons, with the president and vice president of the association, and meet twice a month, and the whole association meet four times a year. The defendant, as general manager, employed the reporters, the editors, and the other employés, including the day manager and the night manager. They were all responsible to the defendant for the carrying out of his directions. The news is gathered by the reporters and is then telephoned to the office, written out by the editors, and then sent out to the various newspapers for publication. Apparently the association had no property, had no income, and did no business except to collect news and send it to various newspapers for publication, and each of the newspapers paid its pro rata share for the expenses incurred in obtaining, writing, editing, and distributing the news to be published.

[1] It is difficult to state just what this association is. It can hardly be called a joint-stock association, as it has no stock or property, makes no profit, and divides among the various newspapers composing it the expenses incurred by the manager in carrying out the objects for which the association was organized. The defendant, as general manager, having the appointment of his subordinates, would undoubtedly be the agent of the various newspapers that were thus organized to accomplish the particular purpose of the association. But it would also appear that he acted independently in organizing the business, appointing employés and others for the purpose of conducting the work of the association, and exercising the entire control of the operations carried on by the News Association. That this defendant was the responsible head of this organization, that he it was who conducted it, is perfectly apparent from the duties which he performed. This being so, I do not see why he is not responsible for the acts of his subordinates.

[2] The responsibility of this defendant or the News Association is not for the subsequent publication in the newspapers, but for the publication of the libel in sending it out to the various newspapers for publication. It is elementary law that all connected with the publication of a libel are responsible as joint tort-feasors for the damage caused thereby. Stokes v. Morning Journal Ass'n, 72 App. Div. 184, 76 N. Y. Supp. 429; Pickford v. Talbot, 211 U. S. 200, 29 Sup. Ct. 75, 53 L. Ed. 146. As I understand the rule, all that is necessary to make the defendant responsible for the publication of a libel is that he or his authorized agents employed by him to make the publication actually published the libel. His agents, in doing what they did, were acting within the scope of the authority conferred on them. Who would be responsible in this case if not the defendant? This association, without property and without responsible members, consisting merely of newspapers, not of individuals or corporations publishing or controlling the newspapers, could not be forced to respond for an injury caused by defendant, or his agents, in the publication of the libel; and he, by accepting such employment as general manager of the association, thereby became a principal chargeable with the acts of those whom he employed to carry out the purpose of procuring and distributing news for publication. The mere fact that this defendant did not in all cases assign reporters to do any particular work, or that he refrained from investigating the reports and articles that were sent out by his subordinates, whom he had the power and authority to control, certainly cannot relieve him from responsibility for the acts of his agents. Once establish the relation of principal and agent between defendant and the employés who sent out this article for publication, as I think the jury were entitled to find from the testimony, I think that the defendant was liable for the publication of the libel. Any other conclusion would render it possible by the establishment of such an indefinite and unsubstantial association, as that shown in this case, to avoid responsibility for the serious damages often caused by libelous publication; and the proprietors and managers of these news associations, spreading as they do charges against individuals, must for the general protection of society be held responsible for the acts of their subordinates and agents.

[3] The only other question presented is whether the court was in error in leaving it to the jury to add to their verdict punitive damages. It seems to me that the instructions can be sustained by Crane v. Bennett, 177 N. Y. 106, 69 N. E. 274, 101 Am. St. Rep. 722. That action was for libel against the New York Herald, and the defendant sought to avoid responsibility for punitive damages upon the ground that at the time of the publication he was absent from this country and that the acts complained of were performed in his absence by his manager and employés. The court said:

"That the proprietor of a newspaper is responsible for all that appears in its columns, although the publication may have been made in his absence and without his knowledge, is too well settled to require discussion. His liability is not on the ground of his being the publisher, but because he is responsible for the acts of the actual publisher. In libel cases, the falsity of the libel being proof of malice sufficient to uphold exemplary damages, the right to

recover them, in the discretion of the jury, rests in the very act done in the publication of the false libel; and whoever is chargeable with that act is chargeable with the legal consequence, which is the right of the jury to redress the wrong by imposing reasonable damages beyond any injury actually shown. Although a mere servant or agent employed to perform some specific act for a principal may not render the latter absolutely liable for increased damages on account of his motives in performing it, yet, when a principal surrenders to his general manager and employés all his business affairs, or the general management of some particular business, absents himself from the jurisdiction where his paper is edited and published, leaving such manager in absolute charge thereof, he is responsible for the manner in which his business is conducted. In other words, a principal surrendering his entire business to another to be conducted for him should be held to the same responsibility he would incur if he himself personally directed it, as to all matters coming within the line of the authority which he has conferred upon such manager or employés. Therefore, while, as was held by the trial court, the defendant might not have been liable for any personal ill will of his employés or servants against the plaintiff, if there was a willful departure from such business for their private or individual purposes, yet he is responsible for the manner in which the business so delegated was performed by his manager, and if the publication complained of was wanton, reckless, or heedless, of the rights or feelings of the plaintiff, and upon being apprised of the groundlessness of the charges there was a continued refusal to make or publish any retraction thereof, the defendant was fully responsible for the acts of his general manager, and liable for such punitive damages as a jury, in its discretion, might award."

In that case the court held that the charge to the jury, "that the falsity of the libel is sufficient evidence of malice to uphold exemplary damages, but the plaintiff's right to recover exemplary damages is in the discretion of the jury," was correct. The court in that case cited and reaffirmed the dissenting opinion of Davis, P. J., in Samuels v. Evening Mail Ass'n, 9 Hun, 288, adopted by the Court of Appeals in reversing that judgment (75 N. Y. 604), establishing that plaintiff in an action for libel gives evidence of malice whenever he proves the falsity of the libel, and it then becomes a question for the jury whether the malice is of such a character as to call for exemplary or punitive damages, and the question is not to be taken away from the jury because the defendant gives evidence that there was, in fact, no actual malice. It was clearly evidence to show that this libel was wantonly, recklessly, and heedlessly published, without inquiry of plaintiff or without any investigation as to its truth. As it seems to me the defendant was responsible for the acts of his agents, I think therefore there is no error which would justify a reversal of the judgment.

The judgment and order should therefore be affirmed, with costs.

McLAUGHLIN and LAUGHLIN, JJ., concur.

CLARKE, J. (dissenting). There is no doubt that the publication complained of was libelous per se. Plaintiff has recovered judgment against certain newspapers which published it and for false arrest against the officer who took him into custody.

The question here is whether this defendant is liable. The charge in the complaint is that the defendant, in conjunction with the New York City News Association, a voluntary association, carrying on business at No. 203 Broadway, borough of Manhattan in the city of New

York, as plaintiff is informed and believes, was prior to, and at the time hereinafter mentioned, and is now, as plaintiff is informed and believes, engaged in the business of collecting and selling news matter to various newspapers and publications published in the city of New York and elsewhere throughout the United States; and that said so-called New York City News Association, as plaintiff is informed and believes, who has made diligent inquiry concerning the same, has no secretary or treasurer upon whom process may be served in accordance with the statute in such case made and provided; that on or about the 18th day of August, 1905, the defendant, using the name of and acting jointly with the said New York City News Association, composed concerning the plaintiff and his said business, and caused to be published, circulated, and distributed to various newspapers in the city of New York and elsewhere in the United States, and to the employés, agents, and officers of the respective persons, corporations, and associations engaged in editing and publishing such newspapers, the false and defamatory matter.

The defendant was the general manager of the New York City News Association. He was not a member of the association. He was its secretary, but as such was not a member of even the executive committee. He received no salary as secretary, but was employed by the association as manager and paid as such. He was therefore merely a paid employé. The association, by its constitution, had for its object the gathering and distribution to its members of any and all kinds of news. The association is not to make a profit and is not to engage in the business of selling and trafficking in news.

Art. 2. Membership and assessments. The New York City News Association shall consist of the following members. (Then follows the names of 18 newspapers and the Associated Press.) The expenses of this association shall be met by a pro rata assessment upon each member. The officers shall be a president, vice president, secretary and treasurer and an executive committee of five. The executive committee shall supervise the routine and work of the association and shall audit its accounts. The association shall appoint a manager and prescribe his duties.

The treasurer testified that there was a man at night and another at day who held the position the same as that of city editor in a newspaper. Their titles were night manager and day manager. "I do not mean Mr. Hardenbergh." The day manager or city editor is there all day and all night and has charge of the reporters of the city department.

Thompson testified that he was a newspaper reporter in the employ of the association; that he got the story about the arrest of George and Phillip Wahlheimer for the City News Association in Jefferson Market Court.

"I did not write it; I telephoned it to the office. I took notes of the story there in court, but I wrote no article. I telephoned the story which I secured from court to the office from my notes and from my memory to the New York News Association for the purpose of furnishing to the newspapers the news of the court."

The charge is that this story was sent by the association to the World and other papers and published by them. The defendant testified:

That he had been connected with the association in the capacity of manager and secretary for nearly 15 years. That it has about 115 or 120 employés, mostly reporters. There are editors, from 8 to 4 at different times. That his duties in connection with that association are to supervise its operations under the direction of the executive committee.

"I mean by supervise that I manage the business end, the financial end, and see that the work is carried on as desired by the executive committee, I do not have anything personally to do with the writing or editing of any stories that are sent in. That work is assigned to the editors by the executive committee, by their direction. I first heard of any such subject as plaintiff's exhibit 4 which you show me when the action was started by Mr. Wahlheimer against the World. I do not know anything about any such story as that having been sent out. I did not ever write or edit such a story. The day manager, when he is on duty, determines what stories shall be sent out, and the night manager when he is on duty. That is not a part of my duties to do any such thing as that. * * * That passing through the office channels is not my duty to supervise, and as a matter of fact I did not edit this story, and I never saw it until long after the commencement of this action."

This action was commenced just before the expiration of the two-year statute of limitations. The court charged the jury:

"The first question for you to determine is: Was Hardenbergh, the defendant here, one of those engaged as a principal in the management of that business; that is to say, was he one, who, no matter what his title was, or what he was called, was engaged in the collection and handing out of that particular kind of news, or was he a mere subordinate employé with clearly defined duties? If you determine that he was a mere employé of whoever was running that association, then you will find a verdict in favor of the defendant; but if you find that he was a person who actually and responsibly was engaged in the collection of news and handing it out to the newspapers at the time in question, then you can come to the consideration of the other questions in the case."

The respondent claims that the defendant may, upon the evidence, be held liable as a joint tort-feasor or upon the doctrine of respondeat superior. I am of the opinion that neither theory supports this recovery. The complaint is framed upon the theory that the New York City News Association is a voluntary association and it is so alleged, and it alleged that it has no secretary and treasurer. That was entirely disproved on the trial. It has a full set of officers. It was the principal and it ought to have been sued. The fact that the names of the papers are used in the constitution instead of the corporations publishing them does not seem to me to be of any importance. The situation was made clear by one of the witnesses:

"When I say a newspaper is a member, I mean that newspaper holds membership in the association, the corporation, not the editor of the newspaper. These general meetings are meetings of representatives of these corporations of these newspapers."

Here we have a personal judgment against a man who was the manager of a voluntary association, upon an alleged publication by that association, of which he knew absolutely nothing until two years after the event. He could not be held on the doctrine of respondeat superior because he was not the superior; he was a mere employé of the as-

sociation which was the superior and could properly be sued under that doctrine. Liability under this doctrine depends upon establishing that the relation of principal and agent or master and servant existed and that the matter was written or published within the scope of such agency or service, and for the benefit of such principal or master. He could not be a joint tort-feasor because he not only had nothing to do with the writing or the publication of the libel, but knew nothing about it. I had always supposed that to be a joint tort-feasor one must join in doing a wrong. The reporter who reported it, the editor who rewrote it, and directed its distribution, might be held as joint tort-feasors. But I cannot see how the general manager or any other employé who had nothing to do with it and knew nothing about it can be so held.

The extraordinary situation here presented is emphasized by the fact that the jury were permitted to find punitive damages against this defendant though entirely ignorant of the libel and its publication. The court charged:

"If you find that the publication was made with such gross recklessness and wanton indifference to the rights of others as to amount to actual malice, you may, if you choose, add a sum for punitive damages."

To which counsel excepted and asked the court to charge that recklessness or carelessness of the reporter cannot be imputed to Mr. Hardenbergh, which was denied and excepted to.

I think this judgment and order should be reversed and a new trial ordered, with costs and disbursements to the appellant to abide the event.

SCOTT, J., concurs.